UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KOMEGA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14CV541 CDP |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner of Social Security's final decision denying Komega Williams's

application for benefits under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401 *et seq.* and 42 U.S.C. §§ 1381 *et seq.*[1]  Judicial review of the

Commissioner's final decision under Title II is available under Section 205(g) of

the Act.  42 U.S.C. § 405(g).  Substantial evidence exists to support the

Administrative Law Judge's Residual Functional Capacity determination, and the

---

[1] Both the complaint and brief in support of the complaint filed by Williams allege that she applied for Supplemental Security Income benefits under Title XVI of the Social Security Act. However, the administrative record shows that she only filed a claim under Title II.

vocational expert properly relied upon that determination when testifying.  I will affirm the Commissioner's decision to deny Williams benefits.

## 1.  **Background**

### 1.1.  Procedural History

On August 8, 2011, Komega Williams filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act. After being issued an unfavorable determination, Williams received a hearing before an Administrative Law Judge (ALJ) on January 10, 2013.[2]  The ALJ determined that Williams was not "disabled" under the Act.  The Appeals Council denied Williams's request for review, and the ALJ's decision now stands as the final decision of the Commissioner.

### 1.2.  Evidence before the ALJ

#### 1.2.1.  *Application for Benefits and Disability Interview*

On Williams's application for disability insurance benefits, she stated that she was born in 1974 and became disabled beginning June 24, 2011.  Tr. 139.  In her Disability Report interview, she alleged disability due to herniated discs, sciatica, and bowel obstruction.  Tr. 156.  These conditions prevented her from

---

[2] Missouri participates in a modified form of the disability determination procedures, which eliminates the reconsideration step in the administrative appeals process.  *See* 20 C.F.R. §§ 404.906, 404.966.  Williams's appeal proceeded directly from initial denial to ALJ review.

walking, sitting, or sleeping. *Id.* She reported that she had completed the 12th grade and did not attend any special education classes. Tr. 157.

Williams recited her past work. From the 1990s to June 24, 2011, Williams worked as a machine operator for several businesses, including a soda plant, the Post Office, and at a cheese plant. During those years, her duties also included packaging/assembly in 2009, clerical work in 2007, and carrying mail in 1998. From 1996 to 1997, Williams worked as a reconcilement clerk for a bank. Tr. 157.

### 1.2.2. *Medical Records*[3]

In December 2002, Williams sought treatment from Dr. Neil Wright, a neurological and orthopedic surgeon. She had experienced neck and shoulder pain, as well as difficulties with fine motor function in both hands. Imaging revealed a herniated disc at C5-6 with early myelopathy and a lumbar cyst. Dr. Wright recommended surgical treatment via anterior cervical discectomy. Tr. 239–41. At some point in December 2002 or January 2003, Williams had a post-anterior cervical discectomy and fusion performed by Dr. Wright; at that time, she also experienced herniated nucleus pulposus at C3-4 and C4-5 with myelopathy. Tr. 204. In March 2003, Dr. Wright noted that Williams had been diagnosed with an

---

[3] Although the court has examined the entirety of the transcript, the summary of medical records includes only those portions pertinent to Williams's claims and the ALJ's decision.

intestinal blockage due to endometriosis and was scheduled for surgery to remove the pelvic mass. Tr. 237.

On June 30, 2004, Williams reported to Dr. Wright that she experienced difficulty turning her neck and had pain in her left arm and hand, causing clumsiness. She described episodic minor numbness in her left leg, but denied any weakness in her legs. Dr. Wright diagnosed her with a disc bulge at C6-7 on the left side, and prescribed an injection. He also noted that she has a mostly asymptomatic lumbar arachnoid cyst. Tr. 235–36.

On March 31, 2005, Williams presented to Dr. Wright with complaints of aches in her neck occurring with rotation to the right side. This caused aches in her shoulder muscles, but Williams denied pain into her arms. She also complained of numbness in both hands, occurring primarily when at her work while repeatedly lifting and carrying. Neurological examination revealed 5/5 bilateral strength of deltoids, biceps, triceps, wrist flexors, grip and hand musculature, with no difficulty in her fine motor function in either hand. Dr. Wright diagnosed her with carpal tunnel syndrome and cervical stenosis; he recommended anti-inflammatory medications and wrist splints. He prescribed Ibuprofen 600mg three times per day. Tr. 231–32.

On January 30, 2008, Williams's primary care physician, Dr. Michael Spezia, certified that she was physically fit to perform a strenuous firefighter

physical performance test, which included lifting, climbing, and carrying heavy objects. Tr. 267. In March 2009, Williams reported to Dr. Spezia "in regards to thyroid." Tr. 262. Several times from August to September 2010, Williams saw Dr. Spezia, describing symptoms of body pain and numbness in her hands and legs. Tr. 255–258

On October 14, 2010, Williams complained to Dr. Wright of severe pains on the left side of her body radiating from her neck down, with lower back pain and pressure numbness in both arms and hands and both feet. She also said she was unable to grip on the left side, was constantly dropping things, and off balance. Radiological tests revealed herniated disks and compression of the spinal cord. Dr. Wright recommended surgery. Tr. 229. Four days later, Williams returned to Dr. Wright. Dr. Wright performed cervical discectomy at C4-5 and C3-4; he then performed anterior cervical fusion at C3 to C5. There were no complications. Tr. 204–06. The next day, Williams was discharged from Barnes Jewish Hospital in a stable condition with a diagnosis of cervical stenosis. She was permitted to perform light activity with instructions to avoid heavy lifting or strenuous exercise. Tr. 208.

On January 12, 2011, Williams returned to Dr. Wright, who reported that she continued to improve. Williams had minimal residual neck pain and her arms were much stronger and more coordinated, with no numbness or pain. Her gait

was also improved.  Tr. 223.  At her six-month follow-up with Dr. Wright for her cervical discectomy on April 28, 2011, Williams reported that her work schedule had increased to ten-hour days, six days per week.  She noticed a corresponding increase in axial neck pain, which she treated with heat and muscle relaxers.  During the physical exam, Williams experienced pain in her cervical spine at the extremes of movement.  Dr. Wright reported that the pains were most likely related to work hours.  Tr. 221.

On June 20, 2011, Williams saw Dr. Spezia for back pain.  Tr. 246.  A little more than two weeks later, on July 6, 2011, Williams reported to Dr. Spezia that she went to the hospital for a "slipped disc" and was experiencing back pain along her left side; she requested pain medication.  Dr. Spezia wrote that Williams could return to work on July 18, 2011.  In response to a telephone call from Williams one week later, Dr. Spezia referred her to Dr. Wright for diagnostic imaging.  Tr. 244–45.

Williams returned to Dr. Wright on July 27, 2011.  She referenced a "pop" in her back that she had experienced while getting off her couch on June 24, 2011.  Williams reported "fairly minimal neck pain and only with prolonged sitting," which constituted "a dull ache at most."  A radiological test showed an extradural cyst at the thoracolumbar junction that was consistent with her known arachnoid cyst.  She experienced tenderness upon palpation of the right paraspinal muscles in

the lumbar region of the spine. Her cervical spine showed full range of motion without pain. Williams denied any pain, weakness, or numbness in her arms. When asked about her legs, Williams denied any numbness in the right leg, any weakness, and any symptoms in her left leg, though she did admit to mild pain in her right hip. Dr. Wright reported that Williams was doing very well with improvement in her cervical radicular symptoms. He recommended epidural injections in the lumbar spine. Tr. 219–220.

On August 1, 2011, Williams reported to the Washington University Department of Anesthesiology for lower back pain at an 8/10 on the right side extending down to her toes; she also reported pain in walking and using the bathroom. After receiving a lumbar nerve root injection, Williams described her pain at 0/10. Tr. 249–52. Two weeks later, Williams again sought nerve root injections. She described her pain at a then-current 6/10, reaching a severity of 9/10 since her last visit, with the pain worsening after sitting or standing for 1.5 to 2 hours. She reported the pain interfered with her work "moderately severely." After the procedure, her pain was again at 0/10. Tr. 275–79. On August 29, 2011, Williams returned for her third visit. She reported losing her job because she lacked medical leave. Her pain was at 5/10, with a range in severity since her last visit between 3/10 and 8/10. The pain interfered with her work "moderately." After the procedure, her pain was at 0/10. Tr. 280–283. On September 26, 2011,

Williams reported her pain was at 7/10, with a range from 2/10 to 10/10 since her last visit.  She did not obtain any medication because she lacked coverage.  Tr. 285–87.

In October 2011, Williams received a posterior lumbar laminectomy to resect her arachnoid cyst; she also received a right-sided discectomy at L2-L3.  She reported pain only in her right leg.  On discharge from the hospital after this surgery, she was restricted to light activities.  Tr. 292–94.  At her follow-up appointment on November 16, 2011, Dr. Wright noted that Williams reported back stiffness and much improved right leg pain.  Williams had no observed weakness in both lower extremities, and her gait was normal.  He recommended physical therapy and discussed the possibility that she could return to work "in several months."  Tr. 295.

On December 16, 2011, Dr. Wright authored a physician statement describing Williams's medical history.  He asserted his belief that she would have permanent restrictions on her ability to lift more than fifteen to twenty pounds and controlling heavy machinery.  Dr. Wright concluded that she "will not likely be able to return to gainful employment."  Tr. 301.

Williams returned to Dr. Wright on January 11, 2012.  She reported that she has no "frank pain" in her back or legs, but does get "crampy pains" in her legs at night while sleeping.  She had no neck or arm pain, and no arm weakness or

numbness.  Williams had full range of motion for both cervical and lumbosacral spine, both without pain.  Her walking was "much improved," and she had a normal gait.  Williams also stated that she had been terminated from her job and was applying for disability.  Dr. Wright noted that she is doing "moderately well with improvement in her radicular symptoms."  Tr. 334.

On July 24, 2012, Dr. Lawrence Wells submitted a physician's statement for disabled license plates to the Missouri Department of Revenue on behalf of Williams.  The application reported that because she could not walk fifty feet without rest, she should be issued a permanent disability plate.  Tr. 338.  Notes accompanying the application state that it was filled out for patient's "bad days." Those notes also listed hypothyroidism among her assessments.  Tr. 339.  On August 28, 2012, Williams complained to Dr. Wells of hypothyroidism, lower-back pain at an 8/10, and a runny nose.  Her thyroid test was normal and she was prescribed thyroid hormone replacement.  Tr. 346.

On September 28, 2012, Williams reported to Dr. Nwanodi for her annual gynecologic examination.  A review of her symptoms lists no neck pain, no muscle aches, no localized joint pain, and no localized joint stiffness.  Tr. 350.

Finally, on November 28, 2012, Williams reported to Dr. Wells for follow-up and medication refills; she had "no problems or concerns."  Tr. 361.  She reported that she does not take her pain medications regularly.  Dr. Wells's notes

show that Williams was exercising regularly.  Her sole assessment was rhinitis.
Tr. 359–61.

### 1.2.3.  *Claimant's Testimony*

Williams testified before the ALJ at the hearing held on January 10, 2013.
Tr. 25–51.  Williams reported that she is right-handed and can drive a car.  On the alleged date of onset, she was sitting on her couch when she heard a loud pop in her back and experienced pain.

Her doctor at that time was Dr. Neil Wright, who prescribed pain medication and an MRI revealed a cyst and "a messed up disc."  Tr. 30–32.  After trying therapy she underwent back surgery.  Dr. Wright refused to release her back to work and gave rehabilitation instructions.

Williams takes hydrocodone twice a day for pain.  She also takes thyroid replacement medication, amitriptyline for muscle spasms, and the muscle relaxer cyclobenzaprine.  Over-the-counter medications include Aleve, which helps with her pain without causing the drowsiness that accompanies her other pain medication.  Tr. 33–34.

Williams's average day begins at 7:00 a.m. and ends at 10:00 p.m.  She walks to exercise and can stand to do chores for fifteen to twenty minutes before needing rest.  Tr. 35–36.  Her left leg has given out on her when she walks any longer, but her doctors recommended against using a crutch or any assistive

device.  When she last worked, Williams used a wrap to help her to sit upright; she can now sit for thirty to forty-five minutes before needing to stand.  Tr. 37.  To pass the day, Williams reads novels and occasionally visits with friends or family.  Each Sunday, she attends church for an hour and a half.  Tr. 38–39.

Williams had two previous neck surgeries, the last being in 2010 to treat herniated discs.  Since that time, she experiences nerve pains in her neck extending down her arm.  After the surgery, she worked approximately six months full-time before she hurt her back (and had the last surgery).  During that time she worked as a machine operator on the can line of a beverage company, where she also did cleaning work.  Tr. 40.

Williams testified about her prior jobs.  Her work at the cheese plant required lifting twenty to thirty pounds and standing.  She worked there from 1998 to 2005, when the plant closed.  Her work at the bank as a reconsignment clerk involved data processing, and her bank teller job did not require reaching.  Tr. 41–43, 48.

Williams described the side effects of her medication as making her feel like she was moving in slow motion.  She also testified that her injuries prevent her from being comfortable, from seeing her side-view mirror while driving, and from keeping her head in a stationary position to look at a computer screen.  Tr. 45–46.

She uses a heating massage pad on her neck.  Williams cannot reach over her head without experiencing pain, but can reach forward.  Tr. 47.

In 2003, Williams had carpal tunnel surgery on both sides.  Her non-dominant left hand hurts worse and sometimes gives out.  Her dominant hand does not have these difficulties, and she can pick up and manipulate small objects with both hands without issue.  Tr. 50–51.

### 1.2.4. *Vocational Expert Testimony*

A vocational expert (VE) also testified at the hearing.  She described Williams's past machine packager, mail carrier, and cheese-making work as medium unskilled and semi-skilled.  The bank teller position was light skilled.  The VE classified the reconcilement clerk position as an adjustment clerk and was sedentary skilled.  Tr. 52–53.  She testified that any skills used as a teller would transfer to skills as a receptionist, which would be sedentary.  Tr. 53.

The ALJ presented a hypothetical person of Williams's age, education, and work experience.  This person could lift up to ten pounds, stand or walk about two hours out of an eight-hour workday, sit for six hours, occasionally stoop, kneel, and crawl.  The person should avoid climbing, working at heights or in extreme cold, should avoid whole-body vibration or heavy machinery, and working above shoulder level bilaterally.

The VE testified that such a person could not perform Williams's past work; but the hypothetical individual could perform a number of jobs that existed in the national economy. Those jobs included sedentary semi-skilled jobs, such as a receptionist or telephone solicitor; they also included unskilled work, like document preparer, administrative support, and laminator. Tr. 53–55.

When adding the requirement that the person be permitted each half-hour to alternate sitting and standing or stretching, the VE testified that all of the jobs would still be workable. Missing more than two days per month or unpredictably having to arrive late or leave early once per week would preclude work. Tr. 55–56. Work would also be incompatible if the person had to alternate work positions every fifteen to twenty minutes or if they actually had to leave the workstation every thirty minutes. Tr. 57.

### 1.3. The ALJ's Decision

The ALJ made the following findings in his decision dated February 11, 2013:

> 1. The claimant met the special earnings requirements of the Act as of June 24, 2011, the alleged onset of disability, and continues to meet them through the date of this decision.
>
> 2. The claimant has probably not engaged in substantial gainful activity since June 24, 2011, although she had $628 in earnings credited to her for the third quarter of 2011.

3.    The medical evidence establishes that the claimant has status-post microdiscectomy at L2-L3, status-post surgeries to the cervical spine, status-post bilateral carpal tunnel syndrome, and hypothyroidism , but no impairment or combination of impairment s that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity is not credible, for the reasons set out in the body of this decision.

5.    The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; climbing of ropes, ladders or scaffolds; doing more than occasional climbing of ramps and stairs or more than occasional balancing, stooping, kneeling, crouching, or crawling; working with either arm above shoulder level; driving trucks or other heavy equipment; or having concentrated or excessive exposure to unprotected heights or other dangerous moving machinery, or to extreme cold or to whole body vibrations (20 CFR 404.1545).

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant's residual functional capacity for the full range of light-sedentary work is reduced by the limitations described in Finding No. 5.

8.    The claimant is 38 years old, defined as a younger individual (20 CFR 404.1563).

9.    The claimant is a high school graduate (20 CFR 404.1564).

10.    The claimant possibly has acquired but not usable skills transferable to the skilled or semi-skilled functions of other work (20 CFR 404.1568).

11.    Based on an exertional functional capacity for light work, and the claimant's age, education, and work experience, 20 CFR 404.1569 and Rule 202.21, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled." Rule 201.28 in Table No. 1 directs the same conclusion if the claimant is exertionally restricted to sedentary work.

12.    Although the claimant's limitations do not allow the performance of the full range of light-sedentary work, there is, using the above-cited Rules as a framework for decision-making, a significant number of jobs in the local and national economies which the claimant could perform.  Examples of such jobs are any of a total of about 8350 light or sedentary jobs in the State of Missouri and about 321,000 of the same jobs nationwide as a receptionist and telephone solicitor (sedentary), and document preparer, administrative support worker and laminator (light), according to vocational expert opinion.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g)).

Tr. 16–17.

## 2.    Discussion

### 2.1.  Legal Standards

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome. *Id.*

Nor may the court reverse because the court would have decided the case

differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In

determining whether existing evidence is substantial, a court considers "evidence

that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting

*Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)). Where the

Commissioner's findings represent one of two inconsistent conclusions that may

reasonably be drawn from the evidence, however, those findings are supported by

substantial evidence. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)

(internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

court is required to review the administrative record as a whole and to consider:

> (1) credibility findings made by the Administrative Law Judge;
> (2) the claimant's age, education, background, and work history;
> (3) medical evidence from treating and consulting physicians;
> (4) the claimant's subjective complaints relating to exertional and nonexertional impairments;
> (5) any corroboration by third parties of the claimant's impairments; and
> (6) testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Brand v. Sec'y of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir.

1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If so, then the claimant is not disabled. 20 C.F.R. § 404.1520(b).

Next, the Commissioner determines if the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 1520(C). If the claimant's impairment is not severe, she is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant has the Residual Functional

Capacity (RFC) to perform her past relevant work.  If the claimant can perform her past relevant work, she is not disabled.

If the claimant cannot perform her past relevant work, the burden of proof shifts and the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  *See Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998); 20 C.F.R. § 404.1520.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include: "(1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions."  *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (citing *Polaski*, 739 F.2d at 1322).  When an ALJ explicitly finds that the claimant's

testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).

## 2.2. Analysis

### 2.2.1. *RFC Determination*

Williams argues that her RFC determination is not supported by substantial evidence, in that the ALJ ignored the only medical opinion evidence of record. Williams points to Dr. Wright's December 26, 2011, statement that Williams was unable to work due to continuing problems with carpal tunnel syndrome and back pain. Williams also points to a statement made by Dr. Wells to the State of Missouri in support of a disabled parking permit for Williams, which asserted that Williams could not walk more than fifty feet.

So far as Williams argues that the medical evidence establishes that she cannot perform light work because she cannot walk more than fifty feet, that argument cannot require reversal. The ALJ specifically found that Williams could perform both sedentary and light work. Although Williams challenges the latter finding, she does not contest the determination that she can perform sedentary work.

The ALJ's RFC determination must be based on some medical evidence, but the ALJ is not required to rely entirely on any particular physician's opinion. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). The ALJ is empowered to resolve conflicts in the evidence, and "may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007)

Dr. Wright's statement in support of disability dated December 26, 2011, suggested that Williams is permanently unable to lift more than fifteen to twenty pounds at a time or operate heavy machinery. The ALJ credited that assessment in his RFC determination. *See* Tr. 17 at ¶ 5. But Dr. Wright also based his conclusion that Williams could not work on her carpal tunnel syndrome and back difficulties. Medical evidence in the record shows that Williams has little difficulty grasping and manipulating small objects with both hands, and her testimony corroborates that conclusion as to her dominant hand. Medical records

from 2012 show that Williams was capable of exercising and had full range of motion for both her cervical and lumbosacral spine, both without pain. The medical evidence conflicts with Dr. Wright's opinion that back difficulties prevent Williams from working, and the ALJ properly discounted that opinion.

Likewise, Dr. Wells's opinion that Williams could not walk for fifty feet is not supported in the record. The medical evidence shows that Williams had a normal gait and did not experience weakness in her lower legs. Williams also testified that she walks for exercise, can stand for fifteen or twenty minutes before her legs give out, and that her doctors recommended against using an assistive device when walking. This testimony undermines any inference that Williams is seriously inhibited in this regard. The ALJ properly discounted the opinion of Dr. Wells.

I find that substantial evidence supports the ALJ's decision, upon which he arrived following a proper legal analysis. Under the standards set out in *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001), residual functional capacity "is the most [a person] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545. This determination turns on "all of the relevant medical and other evidence," including statements from the claimant. *Id.* This other evidence includes: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other

symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; (6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Polaski*, 739 F.2d 1321–22 (8th Cir. 1984); 20 C.F.R. § 404.1529.

The ALJ found that Williams could perform light work, which necessarily includes the ability to do sedentary work. *See* 20 C.F.R. § 404.1567 (b) ("If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."). Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying small items; it often requires "a certain amount of walking and standing" as well. *See* 20 C.F.R. § 404.1567 (a).

As discussed above, the medical evidence of record and testimony by Williams demonstrates that she can stand for at least ten to fifteen minutes at a time, carry up to fifteen pounds, and manipulate small objects. Williams also testified that she can sit thirty to forty-five minutes at a time before needing to

stand.  Williams did testify that she takes hydrocodone for pain twice daily and her pain medications make her feel drowsy and like she is moving in slow motion.  However, she also said that taking Aleve helps with her pain without the negative side effects.  Additionally, the medical records do not indicate that Williams experienced significant side effects from her medications, and her most recent records indicate that Williams is not even taking her pain medications regularly.

Finally, although Williams's application listed her previous bowel obstruction as a reason for her disability, that issue was apparently resolved via surgery in 2003.  As with that issue, her reported problems attributable to hypothyroidism are not reflected in the transcript.  The record contains substantial evidence supporting the ALJ's RFC determination that she can perform sedentary work.

### 2.2.2.  *Ability to Perform Other Work*

Williams argues that the vocational expert's testimony cannot constitute substantial evidence that she is able to perform other work in the national economy, because the hypothetical presented did not reflect her actual RFC.  The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation and citation omitted).  The ALJ's hypothetical questions included the limitations he

found to exist and that were set forth in Williams's RFC. As discussed above, the RFC determination was supported by substantial evidence. Therefore, the question posed was also proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits. *See Lacroix*, 465 F.3d at 889.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is **affirmed**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 16th day of March, 2015.